McDONALD, J.,
dissenting.
In Batson v. Kentucky[1] and subsequent cases, the Supreme Court established an analysis for courts to employ in dealing with an allegation of purposeful racial or gender discrimination in the exercise of peremptory strikes. Key information and data relating to that analysis — the racial and gender make-up of the jury panel, other observable characteristics of the prospective jurors who are struck, and the ultimate composition of the jury selected — may be unknown to an appellate court, but self-evident to the trial judge. Accordingly, the Batson analysis relies heavily on the determinations of the trial judge whose findings are to be accorded “great deference” and reversed only if clearly erroneous.[2]
In this case, the Court attempts to apply the Batson analysis amid some confusion as to whether one or both Petitioners actually preserved a Batson issue and what step of the Batson inquiry is being reviewed. Based on my review of the record, I agree with the Court of Special Appeals that, even if a Batson issue was preserved, the Circuit Court was not clearly erroneous in finding that the Petitioners did not carry their burden of establishing purposeful discrimination. Moreover, *449 this case illustrates the wisdom of dispensing with peremptory-strikes altogether.
The Batson Issue

Preservation

The Court of Special Appeals decided this case primarily on the ground that the Petitioners failed to preserve a Batson issue in the trial court. The Majority opinion comes to a different conclusion. Although my primary concerns do not relate to preservation, we should acknowledge that there is a bit of sleight of hand in concluding that the issue was preserved.
Neither Petitioner actually preserved a Batson issue the way we would ordinarily require. In particular, after questioning the prosecutor’s use of peremptory strikes late in the selection of the jury, Ms. Ray-Simmons ultimately stated that she was satisfied with the jury that was seated — which would ordinarily waive any issue concerning jury selection. See State v. Stringfellow, 425 Md. 461, 469-70, 42 A.3d 27 (2012) (acceptance of the jury panel without qualification waives prior objection because “accepting the empaneled jury, without qualification or reservation, is directly inconsistent with the earlier complaint”) (quotation and alteration marks omitted); Gilchrist v. State, 340 Md. 606, 617, 667 A.2d 876 (1995) (discussing waiver rule in case involving Batson objection); Calhoun v. State, 297 Md. 563, 579, 468 A.2d 45 (1983).
Ms. McGouldrick did not raise any Batson issue at all in the Circuit Court — also a circumstance that would usually be fatal to an attempt to raise a Batson challenge on appeal. The Majority opinion surmounts that obstacle by citing a discussion at a pretrial motions hearing on March 28, 2012, that allowed one defendant to adopt objections made by another, although it is not at all clear that it pertained to jury selection.[3] Majority op. at 439-43, 132 A.3d at 281-83. The selec *450 tion of the jury that sat in this case began a week later on April 4, 2012, and the Batson issue was not raised by counsel for Ms. Ray-Simmons until the following week on April 9, 2012. It seems a very generous reading of the discussion at the motions hearing to apply it to a discussion of peremptory strikes two weeks later — when each party, including all three defendants, were exercising their strikes separately. In any event, the Majority opinion is willing to say that Ms. McGouldrick got on Ms. Ray-Simmons’ train for purposes of making a Batson objection, but got off it by the time Ms. Ray-Simmons waived her own Batson objection at the end of jury selection.[4]
While only Ms. McGouldrick — at best — preserved a Batson issue for appeal in this case, the question whether the prosecutor’s strikes demonstrated a prima facie case of purposeful racial discrimination was presented to the trial court and the trial court ruled on it. In the end, the purpose of the preservation rule is to ensure that the trial court and the opposing party have fair warning of an issue such that the trial court has an opportunity to correct any error. Cf. Peterson v. State, 444 Md. 105, 124-26, 118 A.3d 925 (2015). That appears to have occurred here, although the failure to make and flesh out any Batson issue in the trial court only reinforces the conclusion reached by the Circuit Court for Baltimore City — and the Court of Special Appeals — that the Petitioners failed to establish purposeful discrimination.

*451
Merits

As is sometimes the case when a Batson issue reaches an appellate court, we know little about the racial and gender composition of the jury venire or of the jury that was ultimately selected.[5] In alleging that a Batson violation, counsel for Ms. Ray-Simmons provided only cryptic information about five members of the jury pool, which hinders our consideration of it in this appeal. Neither he nor other defense counsel — to the extent they are deemed to have joined in that allegation— put any information on the record concerning the racial or gender composition of the jury pool or of the jury that was seated.[6] But what is obscure to us was obvious to the trial judge. The trial judge was able to assess that allegation in light of his own observations of, and interactions with, the prospective jurors over several days. Based on what is in the record, there is no reason to hold that the trial judge was clearly erroneous in his ruling.
The Majority opinion accurately describes the three-step Batson analysis. Majority op. at 435-37, 132 A.3d at 278-80. The Majority’s decision to reverse the murder convictions in this case appears to turn on one peremptory strike made by the prosecution. It is useful to provide the context, as best we know it from this record, in which that strike was made.
Two Batson challenges were made during jury selection. First, the prosecution alleged that there was a racial pattern in the 12 strikes made up to that point by one of the co-defendants (who is not a party to this appeal). The trial court asked defense counsel to explain a sampling of those strikes *452 before concluding that there was not even a prima facie case for a Batson violation.
Counsel for Ms. Ray-Simmons then made a similar allegation as to the five strikes made by the prosecution. As he had done with respect to the first Batson challenge, the trial judge turned to the attorney who had made the strikes — the prosecutor. As the Majority opinion recounts, the prosecutor provided more than a sampling, stating reasons for each strike, which tended to focus on the youth of the prospective jurors and past encounters with law enforcement. As he had with respect to the earlier Batson challenge as to the defense strikes, the trial judge concluded that not even a prima facie case had been established.
Neither the Petitioners nor the Majority opinion seem to take issue with the reasons offered for four of the strikes. Everything focuses on the prosecutor’s statement with respect to her strike of Juror 4583. The prosecutor stated that she “intended to replace him with another black male” (but that counsel for Ms. Ray-Simmons had struck the prospective replacement). The prosecutor also stated that she would make additional strikes based on youth.
The record appears to corroborate this explanation. It is notable that, with respect to the other four prospective jurors who were the subject of the State’s peremptory strikes, the prosecutor exercised a peremptory strike against each of those jurors before they were seated in the jury box. However, when Juror 4583 was initially considered, the prosecutor deemed him “acceptable” and Juror 4583 was seated in the box as Trial Juror 5. After the box had been filled with 12 jurors, counsel for each party proceeded to strike jurors from the box, presumably to substitute the next member of the remaining venire as a preferable juror. Most such strikes were exercised by the defendants, but the prosecution struck Juror 4583 from seat 5, which would have had the effect of substituting the next juror in line — Juror 4765 — as Trial Juror *453 5.[7] However, that juror was immediately struck by counsel for Ms. Ray-Simmons. The record corroborates that the substitute juror 4765 was male (the clerk addressed him as “Sir”). While the written record does not indicate his race, none of defense counsel disputed the prosecutor’s assertion that he was black. Nor did anyone dispute that she was striking prospective jurors who were younger.
The Majority opinion concludes that the prosecution’s strike of Juror 4588 was not race and gender neutral, because she made reference to the race and gender of the juror who would have taken his place. Majority op. at 445, 132 A.3d at 284-85. In context, the statement does not support a finding of purposeful discrimination. It appears that the prosecutor’s explanation was that she had found the next prospective juror in line preferable to the one she had already agreed to seat as Trial Juror 5. She was pointing out that her intended substitution would not have affected the gender and racial make-up of the jury — which contradicted the contention that there was a prima facie showing of purposeful discrimination. In other words, she was contesting step one of the inquiry — whether there was a prima facie showing of purposeful discrimination. The trial judge, who was able to assess any pattern in strikes against the composition of the entire venire, agreed with her and found that a prima facie case had not been made.
From our perch on the appellate bench, perhaps it would be helpful to have a fuller explanation from the prosecutor as to why she preferred Juror 4765 to Juror 4583, even though it would not have changed the racial and gender make-up of the jury, or to have more information about the jury venire.[8] The trial judge was in a position to assess whether Trial Juror 5 *454 was younger than his intended replacement and whether that strike fit the pattern proffered by the prosecutor. It is evident to anyone who reads the transcript of the five days spent on jury selection in this case that the trial judge carefully controlled the jury selection process and was very attentive throughout it.[9] He concluded that a prima facie case of purposeful discrimination had not been established, and I cannot say that his assessment of the facts relating to the Batson issue was clearly erroneous.[10]
Peremptory Strikes
The prosecutor’s statement, even if not a Batson violation, may be disquieting as it seems to treat an individual as a crudely defined commodity who is interchangeable with other individuals who share particular characteristics. This is not unusual in the world of peremptory strikes. It is one of several reasons for abolishing peremptory strikes.
In Batson itself, Justice Thurgood Marshall suggested in a concurring opinion that ending discrimination in peremptory strikes would be best achieved by abolishing peremptory strikes altogether.[11] Others have come to the same conclu *455 sion.[12] And we have the power to do that in Maryland through a change in the rules.[13]
There is no compelling reason to retain peremptory strikes. They are not required by the State or federal constitutions.[14] They are a product of English common law, under which the Crown (the prosecution) had an unlimited number of strikes and a defendant was given 35 peremptory strikes as a sort of compensation.[15] The number of peremptory strikes for each side was reduced over the years and eliminated altogether in England during the last century.[16]
*456 There are good reasons to disclaim this part of our legal inheritance. In practice, even when not based on invidious discrimination, peremptory strikes are usually the product of hunches, stereotypes, and folklore. The renowned trial lawyer, Clarence Darrow, once explained his rules of thumb for exercising peremptory strikes:
Never take a German; they are bullheaded. Rarely take a Swede; they are stubborn. Always take an Irishman or a Jew; they are the easiest to move to emotional sympathy. Old men are generally more charitable and kindly disposed than young men; they have seen more of the world and understand it.
quoted in R. Hanley, Getting to Know You, 40 Am U.L. Rev. 865, 866 (1991). (We do not know what Mr. Darrow thought of women or members of racial minorities as prospective jurors as they were absent from the jury pool in his day.) Other famous trial lawyers have relied on body types, physiognomy, and the like. Id. Given the limited inquiry that typically occurs during voir dire,[17] trial lawyers likely have little else on which to base their strikes. Counsel for Ms. Ray-Simmons made precisely this point in despairing of the limited information available during the jury selection process in this case:
So, where — how do we just X them? Based on looks alone or, Your Honor, that’s like asking us all to pick a jury based on tea leaf reading or something....
State v. Ray-Simmons, et al., Case No. 110308026, etc. (Transcript of March 28, 2012 at p. 208). As long as we retain challenges for cause as part of the jury selection process, there is no reason to enshrine such arbitrary judgments as part of our system of justice.
Conclusion
The respected trial judge, now a federal judge, who oversaw the lengthy jury selection process in this case aptly summa *457 rized the purpose of that process: “[PJicking a jury isn’t rocket science, all you want is a group of people that are fair.” State v. Ray-Simmons, et al., Case No. 110308026, etc. (Transcript of March 30, 2012 at p. 240) (Hon. George L. Russell, III). In my view, he was not clearly erroneous when he found that a prima facie case of purposeful discrimination was not established. Reversing the murder conviction of a defendant who professed to be satisfied that she was being tried by a fair and impartial jury ultimately does little to improve the jury selection process. Instead, we should follow the example of the legal system that gave us peremptory strikes and abolish them in favor of a process limited to challenges for cause.

. 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

. E.g., Hernandez v. New York, 500 U.S. 352, 363-66, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991); Batson, 476 U.S. at 98 n. 21, 106 S.Ct. 1712.

. The discussion appeared to relate to the conduct of the trial — the motions hearing dealt with what evidence could be admitted at trial'— *450 not jury selection. An aborted attempt at jury selection did not start until the next day, March 29, 2012. After devoting two days to qualifying the initial jury panel, the Circuit Court dismissed that venire when a threat against one of the prosecution's witnesses and a possibly related shooting required a recess for investigation and possible postponement of the trial. The jury selection process began anew with a new jury panel on April 4, 2012.

. The Majority opinion notes that, in contrast to Ms. Ray-Simmons' counsel (who stated that the jury was "acceptable” without reservation), Ms. McGouldrick’s counsel stated that the jury panel was acceptable "safe from prior objections,” although he made no specific reference to the Batson issue raised by counsel for Ms. Ray-Simmons. Majority op. at 440-41, 132 A.3d at 282.

. We can surmise the gender of most jurors from statements of the court clerk, who politely addressed each prospective juror as "Sir” or “Ma’am.” But the record provides little information about race, age, and other characteristics that would have been immediately obvious to those in the courtroom.

. As best I can tell, the only reference to the racial make-up of the venire occurred in a different context — with the first venire — when counsel for Ms. McGouldrick noted that 14 of the 15 jurors who responded to a question on religious beliefs were African-American.

. Five more jurors were struck from the box, as the parties apparently attempted to replace seated jurors with remaining members of the venire that they deemed in some way preferable.

. Perhaps if we knew the composition of the jury pool, we could make our own assessment whether the prosecution was striking black male jurors at a disproportionate rate. For example, in Johnson v. California, 545 U.S. 162, 125 S.Ct. 2410, 162 L.Ed.2d 129 (2005) and Batson itself, a prima facie case was established when the prosecution’s peremptory strikes had the effect of eliminating all of the prospective black *454 jurors. See also Central Alabama Fair Housing Center, Inc. v. Lowder Realty Co., 236 F.3d 629, 637 (11th Cir.2000) (“an inference of discrimination based on the number of jurors of a particular race may arise where there is a substantial disparity between the percentage of jurors of one race struck and the percentage of their representation on the jury.”). However, Ms. Ray-Simmons provided no such information when she made her challenge.

. For example, at the conclusion of the selection process, he reminded defense counsel that they had raised questions earlier about one of the seated jurors and inquired whether they wished to exercise one of their unused peremptories to excuse that juror.

. The Majority opinion contends that it is irrelevant whether there was a prima facie case on the ground that the prosecutor's statements automatically moved the discussion to step two of the Batson analysis. Majority op. at 444-45, 132 A.3d at 284. But the prosecutor’s statement appears to be addressed to step one of the analysis — and that is apparently how the trial judge understood it as well.

. 476 U.S. at 105-8, 106 S.Ct. 1712.

. See, e.g., Miller-El v. Dretke, 545 U.S. 231, 266-73, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005) (Breyer, J.) (cataloging the inadequacies of the Batson approach and concluding that "a jury system without peremptoriness is no longer unthinkable”); Washington v. Saintcalle, 178 Wash.2d 34, 309 P.3d 326, 347-51 (2013) (Gonzalez, J., concurring); Minetos v. City University of New York, 925 F.Supp. 177 (S.D.N.Y.1996) (Motley, J.); M. Hoffman, Peremptory Challenges Should be Abolished: A Trial Judge's Perspective, 64 U. Chi. L. Rev. 809 (1997).

. In criminal cases in Maryland, peremptory challenges are provided by rule and statute. See Maryland Code, Courts & Judicial Proceedings Article, § 8-420; Maryland Rule 4-313. However, because peremptory strikes concern practice and procedure in the circuit courts, a later-enacted rule that abolishes peremptory strikes would trump not only the current rule, but also the statute. See, e.g., County Federal Savings & Loan Ass’n v. Equitable Savings & Loan Ass’n, 261 Md. 246, 252-53, 274 A.2d 363 (1971); Smith v. State, 5 Md.App. 633, 634 n. 1, 248 A.2d 913, cert. denied, 254 Md. 719 (1969) (statute forbidding guilty pleas in murder cases overridden by later court rule); 66 Opinions of the Attorney General 80, 84 (1981) ("as between an inconsistent rule of the Court of Appeals and a statute enacted by the General Assembly, the last enacted will prevail”).

. See Rivera v. Illinois, 556 U.S. 148, 157, 129 S.Ct. 1446, 173 L.Ed.2d 320 (2009); Gilchrist, supra, 340 Md. at 620 n. 2, 667 A.2d 876.

. See M. Hoffman, Peremptory Challenges Should be Abolished: A Trial Judge’s Perspective, 64 U. Chi. L. Rev. 809, 816-22 (1997). The prosecution received unlimited strikes apparently on the theory that the Crown could do no wrong and that its strikes were necessarily for good cause. Needless to say, we no longer subscribe to that theory.

. Peremptory challenges were abolished in England in 1988. See Miller-El, supra, 545 U.S. at 272, 125 S.Ct. 2317.

. See Pearson v. State, 437 Md. 350, 86 A.3d 1232 (2014).